UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

         Plaintiff,

                                    Case No. 94-220-CR-T-24(A)
-vs-                                19 December 1995
                                    Tampa, Florida
                                    10:25 a.m.

BRUCE WAYNE HARRISON,

         Defendants.
-------------------------------/

             TRANSCRIPT OF **SENTENCING HEARING**
        BEFORE **THE HONORABLE SUSAN C. BUCKLEW,**
          UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:        **WALTER FURR, ESQUIRE**
                           **STEPHEN KUNZ, ESQUIRE**
                           United States Attorney's Office
                           Middle District of Florida
                           500 Zack Street, Room 410
                           Tampa, Florida 33602

For the Defendant:         **BJORN ERIK BRUNVAND, ESQUIRE**
                           Bjorn E. Brunvand, P.A.
                           1212 Court Street
                           Suite C-1
                           Clearwater, Florida 34616

For the Probation Dept.:   **RICHARD WILLIAMS**

Reported By:               PAUL K. SPANGLER, RPR,
                           Official Court Reporter
                           Certificates of Merit and
                            Proficiency, Notary Public
                           (813) 273-9751

STENOGRAPHICALLY RECORDED
COMPUTER-AIDED TRANSCRIPTION
BY ECLIPSE

1                              <u>INDEX TO WITNESSES</u>

2      <u>Witness</u>                  <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>

3

4      BRUCE WAYNE HARRISON        5

5      CLIFF RAISOR               41

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   (10:25 a.m.)    P R O C E E D I N G S

 2            THE COURT:  We need to -- I believe Mr. Harrison

 3   is next.

 4            All right.  If you will let me know when

 5   Mr. Harrison is up.  I'm going to leave the bench.

 6            THE MARSHAL:  Yes, ma'am.

 7            (Short recess) (10:25 a.m.)

 8            THE BAILIFF:  All rise, please.

 9            (Pause)

10            This Honorable Court is in session, the Honorable

11   Susan C. Bucklew presiding.  Be seated, please.

12            THE COURT:  All right.

13            The matter that is set for sentencing is the

14   United States of America versus Mr. Harrison, Bruce Wayne

15   Harrison, 94-220.

16            Mr. Harrison, I'm going to -- well, let me ask

17   counsel to state their appearances for the record, starting

18   with counsel for the Government, please.

19            MR. KUNZ:  Stephen Kunz and Walter E. Furr on

20   behalf of the United States, Your Honor.

21            THE COURT:  Mr. Brunvand.

22            MR. BRUNVAND:  Bjorn E. Brunvand on behalf of Mr.

23   Harrison.

24            THE COURT:  All right.

25            And Mr. Harrison is present in the courtroom.
```

1          Mr. Harrison, if you would stand, please, sir.

2   I'm going to swear you in and ask you some questions about

3   medication and so on.

4          THE DEPUTY CLERK:  Please raise your right hand,

5   sir.

6   Thereupon,

7                    **BRUCE WAYNE HARRISON,**

8   the defendant, having been duly sworn to tell the truth,

9   the whole truth and nothing but the truth, was examined and

10  testified as follows:

11         THE DEFENDANT:  I do.

12         THE DEPUTY CLERK:  Please state your name, and

13  spell your last name for the record.

14         THE DEFENDANT:  Bruce Harrison.  H-A-R-R-I-S-O-N.

15         THE COURT:  Mr. Harrison, are you taking any type

16  of medication this morning?

17         THE DEFENDANT:  No.

18         THE COURT:  Had any drugs, alcohol or medication

19  within the past 24 hours?

20         THE DEFENDANT:  No.

21         THE COURT:  Mr. Harrison, I have in front of me a

22  Presentence Report.  Have you had an opportunity to read

23  over the Presentence Report?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Have you had a sufficient amount of

```
 1   time to discuss it with Mr. Brunvand?

 2              THE DEFENDANT:  Yes.

 3              THE COURT:  All right.  Thank you, sir.

 4              Mr. Brunvand, is there any reason why I should

 5   not proceed with sentencing at this time?

 6              MR. BRUNVAND:  No, Your Honor.

 7              THE COURT:  All right.

 8              Mr. Kunz, any reason on behalf of the Government?

 9              MR. KUNZ:  No, ma'am.

10              THE COURT:  All right.

11              Prior to my ruling on any objections, the

12   guideline calculations, as determined in the Presentence

13   Report, are a total offense level of 44, and a criminal

14   history category of two, the imprisonment range is an

15   imprisonment range of life, plus 25 years.

16              I would like to specifically address the

17   calculations in the guidelines as computed by the Probation

18   Office, so if you will give me just a minute here to find

19   it.

20              The base offense level is a level 38.  The

21   Probation Office has also included a two-level upward

22   adjustment for the possession of a firearm, a four-level

23   upward adjustment for Mr. Harrison's role in the offense,

24   and that is the adjusted offense level of 44.

25              The criminal history category is based on a --
```

1    one point for an improper exhibition of a firearm, and an

2    additional two points for a probation, and that would come

3    out to three, which means a criminal history category of

4    two.

5         So the objections -- the Government has no

6    objections to the calculation of the guidelines by the

7    Probation Office.  So, Mr. Brunvand, you have several

8    objections.  I would suggest that we start with you.

9         MR. BRUNVAND:  Judge, the, uh -- as to the

10   quantity of cocaine, uh, as set forth, I have several

11   objections that should be included in the report that was

12   submitted to the Court.

13        Basically, uh, the calculations, as far as the

14   initial responsibility for sentencing purposes, we would

15   argue should be four kilograms of cocaine and thirty-two

16   hundred pounds of marijuana and 30 kilograms of cocaine for

17   the offloads.

18        However, I would go further on that and suggest

19   to the Court that Mr. Harrison should not be held

20   responsible for more than, uh, a kilogram of cocaine.  And

21   the basis for that is that he became involved in a, uh,

22   lengthy Government investigation, uh, he became involved

23   in, uh, offloading and transporting drugs, uh, in, uh,

24   large amounts.  However, it was clear, uh, from the

25   Government's own investigation that he did not have the

1    ability, uh, to purchase, uh, to distribute, uh, to sell,

2    uh, quantities anywhere near one kilogram, never mind three

3    tons, which is the combined total that we're dealing with

4    in this case.

5         In fact, the Government -- I believe Detective

6    Jankens had testified at one point that a kilogram of

7    cocaine, uh, could have a street value of about forty

8    thousand dollars for people that would be selling it at the

9    street level.

10        Mr. Harrison, uh, early-on was offered the

11   opportunity, rather than the ten people that were going to

12   be part of the offload receiving a thousand dollars each,

13   for a total of ten thousand, they could receive a kilogram

14   of cocaine.

15        It was rejected.  It was said he didn't know what

16   to do with it.  There was also some statements suggesting

17   that it was too hot, and what-have-you, and he didn't know

18   probably, uh, that the, uh, law enforcement was, uh,

19   looking at him too closely.

20        But I would suggest to the Court if that was the

21   case, if that truly was the case, then he wouldn't have

22   been part of the offloads either.

23        Judge, it's -- it's a, uh -- being here earlier,

24   I think application note 17 is analogous, that this case

25   certainly falls outside of the heartland.  Uh, a life, uh,

1  sentence, which is what he basically -- what he is looking

2  at as a result of the large amount of the cocaine, uh, for

3  someone who has no prior felony record, uh, for someone who

4  had no ability and certainly there was nothing shown that

5  he had any ability whatsoever to even deal in a kilogram of

6  cocaine.

7       Uh, and -- and because of that, I would ask the

8  Court to consider, uh, departing on the weight issue,

9  departing, because it does, uh, make it disproportionate.

10  And, uh, rather than the departing, uh, equivalent levels

11  with other defendants, I think the departure should be

12  based on getting -- trying to get an equivalent sentence.

13  The, uh -- that goes to paragraph 70, 80, 81, 102, 119 and

14  125, the quantity of cocaine.

15       Judge, as to the firearm enhancement, I had, uh,

16  recently became aware of the case of Bailey versus

17  United States.  And I understand the Government's position

18  as to -- Mr. Harrison was convicted of this, uh, and -- and

19  so the case really doesn't apply.

20       Judge, I would suggest to the Court, maybe the

21  appropriate thing regarding the, uh, two convictions of

22  carrying a firearm would be in light of the new case to

23  revisit the issue of judgment of acquittal.

24       I don't think the, uh -- the evidence -- the

25  videotape showed what appeared to be a gun in the back of

1    Mr. Harrison's pants on two occasions.  Uh, the -- and --

2    and a gun, what appeared to be a gun, in Mr. Harrison's lap

3    inside of a truck on the surveillance tape.  That charge,

4    by the way, was JOA'd early on.

5         Uh, the Bailey versus United States -- and I

6    don't have -- all I have is the West Law cite, 1995 West

7    Law 712269 -- discusses the use, and specifically talks

8    about -- factually, it's distinguishable.  There's no

9    question about that.  Factually it is distinguishable in

10   those -- the facts in this case under the two defendants,

11   it's, I believe, locked in the trunk of a car and in a --

12   locked in a, uh, cabinet inside a bedroom.

13        THE COURT:  Trunk in the bedroom.

14        MR. BRUNVAND:  Right.

15        However, I think the case leaves the door open.

16   I think it leaves the door open and it specifically talks

17   about, you know, what is used.  It talks about the

18   brandishing, displaying, bartering, striking, firing, or

19   attempting to fire a firearm.

20        Uh, clearly that didn't occur.  Clearly, uh, at

21   best we saw what appeared to be a firearm -- that was never

22   identified as being one of the firearms that were actually

23   introduced into evidence -- in the back, once in a while

24   when the -- when the top of the shirt would go up.  There

25   was no brandishing, and there was no use of the firearm.

1    THE COURT:  Why would there have to be, if he

2  carried it?  Because that's a second -- which is why, the

3  fact that these are factually distinguishable makes a huge

4  difference here because clearly Mr. Harrison, even by

5  looking at the videotape, had the firearm, uh, tucked --

6  tucked in his pants.

7    And, uh, in the case that you have cited, the

8  Bailey case, it has to do with use because of where the

9  firearm was located, and carry wouldn't apply here.  Carry

10  clearly applies, and the Court says that they do not

11  address the issue of the carry prong based on the Appeals

12  Court ruling.

13    So, you know, number -- and I'm addressing two

14  issues.  The Court clearly says, number one, uh, the carry

15  prong of Section 924(c)(1), for example, brings some

16  offenders who would not satisfy the use prong within the

17  reach of the statute, which is clearly the case, I believe,

18  with Mr. Harrison.

19    And secondly, the Sentencing Guidelines

20  2D1.1(b)(1) provides an enhancement for a person convicted

21  of certain drug trafficking offenses if a firearm was

22  possessed during the offense.

23    So they're not doing anything about the

24  enhancement for the use of a firearm.  And clearly what we

25  have here is the carry prong, as opposed to the use prong.

1    So, you know, unless you can show me something

2  that I'm not seeing here, I don't think the Bailey case is

3  applicable to the facts that we have in our case.

4    MR. BRUNVAND:  Judge, my argument is that the

5  Bailey case, uh, uh, is -- is one step in the right

6  direction, and that this Court could take the second step.

7  And that is to extend it to Mr. Harrison.  To, uh, extend

8  it, having -- having been here in the courtroom and

9  listened to everything, and -- and -- and -- and realizing

10  not only the -- the -- the, uh, uh, elements of the

11  offense, but also the -- the -- the sentence that -- that,

12  uh, is called for, uh, in the event that -- that this, in

13  fact, is -- that statute is supposed to apply to

14  Mr. Harrison's circumstances.

15    And -- and -- and to make a finding that -- that

16  no, the United States Congress did not intend for someone

17  like Mr. Harrison to spend 25 years consecutive to his

18  other sentence with these facts.  And -- and I think the

19  Court can -- can make that step, and -- and I think the

20  Appellate Courts can extend this case and -- and -- and --

21  and approve the Court's decision.

22    And I think it's important for this Court to make

23  the step because this Court, uh, listened to all the facts,

24  listened to all the evidence, and -- and -- and -- and --

25  and can recognize that -- that that sentence is too harsh

1    and this is not the scenario that this -- that was intended

2    to -- to -- to include.

3         And -- and -- and, Judge, I have no cases to

4    support that, uh, other than, uh, generally just the Eighth

5    Amendment and -- and -- and, uh, doing what I perceive is

6    being the right thing, and the judiciary controlling, uh,

7    uh, Congress and making sure that people are treated

8    fairly.

9         THE COURT:  Unfortunately, the judiciary does not

10   control Congress.

11        MR. BRUNVAND:  No, but -- but it interprets the

12   statutes and can interpret it and then say that this is not

13   what was -- that this was not the intent, and this goes

14   beyond what the intent was of -- of -- of that statute.

15        Judge, as to, uh, my -- my third argument that

16   relates to paragraph 130, role in the offense, the, uh,

17   Probation and, uh, the Government has proposed that a

18   four-level enhancement should apply because of

19   Mr. Harrison's role in the offense.

20        Judge, the -- basically, this was a Government

21   operation from beginning to end.  Uh, from telling

22   Mr. Harrison who was needed, from telling Mr. Harrison you

23   need to -- about the coffee, about the gloves, about --

24   everything was orchestrated by the Government.  Uh, the

25   majority of what you heard from Mr. Harrison on the tapes

1    was, yeah, hum-hum, yeah, all right, okay, no problem.

2            That was -- that was the majority of it.

3            There -- it took no planning on Mr. Harrison's

4    part.  Uh, the first time he shows up with -- with -- with,

5    uh, two individuals.  Supposed to have four people there.

6    Uh, he was not an organizer, he was not a planner, he was

7    not a leader.  The only leaders in this case, the only

8    organizers in this case was the United States Government.

9    It was all done for them and by them.  And -- and -- and,

10   uh, uh, Mr. Harrison was just as much a mule as everyone

11   else who was involved in this case, outside of the

12   Government agents.

13           And -- and therefore, uh, it is our position that

14   not only does he not deserve the enhancement, but he

15   actually should have a reduction as being a minimal

16   planner.

17           Adjustments for acceptance of responsibility.

18   Uh, Mr. Harrison, uh, filed motions pretrial arguing, uh,

19   governmental misconduct, arguing that the case should be

20   dismissed because of that.  He never -- we never disputed

21   the, uh, assertions as to the drug offloads and -- and --

22   and the drug transports.

23           He did not take the stand to dispute that.  That

24   is what he was convicted of.  He does dispute and always

25   has disputed the Shelly Dinsmore incident.  Although that

1   incident was proven, uh, uh, it -- it's not a federal crime

2   because it was not, uh, part of the, uh -- he was not found

3   guilty of a racketeering activity, conspiracy to racketeer.

4           I think it's important as to that to also

5   consider the fact that he did go through a full jury trial

6   in state court.  He did testify in state court in that

7   incident, and a jury of his peers, or a jury of citizens

8   of -- of -- of Hillsborough County, uh, found that he was

9   not guilty of that offense.  And we should leave it at

10  that.

11          And so, therefore --

12          THE COURT:  Well, this -- it was not -- the jury

13  found that was not proven; is that correct?

14          MR. BRUNVAND:  No, no.  They found it was proven

15  here, but in state court -- in state court it was --

16          THE COURT:  Oh, I'm sorry.  Yes, all right,

17  right.  But -- well, I'll let the Government address a

18  response to that.  But go ahead.

19          At any rate, I'm not sure that this is -- this is

20  particularly relevant in light of the fact that there was

21  no finding of, uh, guilt on the racketeering.

22          MR. BRUNVAND:  Right, right.

23          Well, I was just anticipating that the Government

24  may discuss that as being part of why he should not get

25  adjustment of acceptance of responsibility.  And I'm basing

1    my argument on application note two to the United States

2    Sentencing Guidelines 3E1.1.  And would urge the Court

3    to -- to extend, uh, a reduction, uh, to Mr. Harrison,

4    based on the fact that he did accept responsibility.

5            The next --

6            THE COURT:  Well, let me read through 3E1.1.

7            MR. BRUNVAND:  Okay, I'm sorry.

8            THE COURT:  If the defendant clearly demonstrates

9    acceptance of responsibility for his offense, decrease the

10   offense level by two levels.  It goes on to say if the

11   defendant qualifies for a decrease under subsection A, the

12   offense level determined prior to the operation of

13   subsection A is level 16 or greater, and the defendant has

14   assisted authorities in the investigation or prosecution of

15   his own misconduct, but taking one of the more following

16   steps, decrease the offense level by an additional one.

17   You're suggesting --

18           MR. BRUNVAND:  Two.

19           THE COURT:  Two.

20           All right, thank you.

21           MR. BRUNVAND:  Judge, as to criminal history.

22   The, uh, Government has indicated that Mr. Harrison was on

23   probation.

24           THE COURT:  Actually, the Probation Office has.

25           MR. BRUNVAND:  Oh, right.  Well, actually,

1    initially -- well, that's right.  The Probation Office

2    agrees with the Government that, uh, he was on probation in

3    Pinellas County, uh, during part of this investigation.

4         Judge, the, uh -- and -- and I believe that the

5    record has been admitted, or actually a copy of a

6    conviction has been admitted.

7         THE COURT:  Yes.

8         MR. BRUNVAND:  The conviction was for a

9    misdemeanor offense.  And the probation that's referred to

10   was -- was called Court-supervised probation.

11        Uh, I would suggest to the Court that that is not

12   probation because Court-supervised probation does not

13   exist.  It's not recognized under Florida law.  And -- and

14   therefore, uh, it should not be counted as being probation.

15        Uh, it is something that, granted, happens, uh,

16   from time to time when cases are weak and they want to

17   resolve cases, but it's not recognized in -- in Florida

18   law.  And so, uh, therefore, I would argue that, uh, in

19   spite of the fact that it may say that he was placed on

20   probation, he could not have.  Not -- or he was not,

21   because it was not a legal sentence.

22        THE COURT:  Do you have a statute to point me to?

23        MR. BRUNVAND:  No, I have a -- that's what I'm

24   basing it on.  There is no statute authorizing

25   Court-supervised probation in the State of Florida.

```
 1              THE COURT:  Or a case that says there's no such

 2   thing as Court-supervised --

 3              MR. BRUNVAND:  No.  No, I don't.

 4              THE COURT:  All right.

 5              MR. BRUNVAND:  Also, we would object to -- and --

 6   and basically, if you were to find that he was not, uh, uh,

 7   on probation, uh, that it was not a probationary sentence,

 8   that would change it from category two to category one, as

 9   far as the offense level.

10              Lastly, we would object to the inclusion in the,

11   uh, uh, Presentence Report of numerous, uh, racketeering

12   activities, alleged racketeering activities, that were

13   not -- many of which were not proven; many of which have

14   nothing to do with Mr. Harrison; many of which occurred

15   while Mr. Harrison was serving this country in Vietnam.

16              And -- and -- and -- and basically, uh, we would

17   argue that that should not be part of the Presentence

18   Report and should be eliminated.  And for -- it makes no

19   difference for purposes of what the offense level is, but I

20   think it does make a difference for purposes of -- of, uh,

21   when he goes, uh -- when he's sentenced and -- and -- and

22   this report goes with him.  And -- and I would ask that it

23   be deleted.

24              Judge, I also have -- I apologize that I, uh --

25   if I could hand it to the Court at this time, I apologize
```

1    for the late hour of doing so.  I gave a copy of this

2    report to U.S. --

3           THE COURT:  Point me to the Presentence Report,

4    since you have -- have stated this, obviously in attempting

5    to influence the Court, or for some reason -- point me to

6    the sections in the Presentence Report that you said

7    conduct that occurred while Mr. Harrison was serving in

8    Vietnam.

9           Can you show me that?

10          MR. BRUNVAND:  Okay.  Actually, you know, uh,

11   Judge, I may be wrong on that.  I was thinking about the

12   1970 incident, but that's not in there, I don't believe.

13   And so is the '75 -- I stand corrected on that.  I

14   apologize for that.  Let me see.

15          (Pause)

16          No, it's not included.  I apologize.  I was

17   thinking about the, uh, allegations that were, in fact,

18   part of the Indictment but -- but it's not part of it.

19          Judge, one additional matter.  I have a, uh,

20   report, if I could approach, a psychological testing

21   report.  I've given a copy to the U.S. Attorney.  Uh, if I

22   could approach with it.

23          Judge, Dr. Pine, who is not available to come in

24   to testify, uh, indicated to me that the reason he was not

25   available is because of a -- Federal Government being in a

1    furlough.  He works for the VA Hospital and -- and -- in

2    Bay Pines.  And because of the furlough, uh, the fact that

3    they're on furlough at this point, if he was to leave or

4    take leave of absence, he would not be able to return to

5    his job and he could not afford to do so.

6         But I would ask the Court to -- to consider, uh,

7    this report and -- and in evaluating the sentence of

8    Mr. Harrison.  Specifically, uh, he -- Dr. Pine evaluated

9    Mr. Harrison in light of his service in Vietnam,

10   specifically testing for post traumatic stress disorder,

11   which he has never done in the past of Mr. Harrison, and

12   did have a diagnostic impression of post traumatic stress

13   disorder.

14        Uh, the, uh -- basically the profile that he, uh,

15   put forth that I think -- which is relevant to this case,

16   is that he describes Mr. Harrison, uh, as -- as being a

17   follower rather than a leader; that he, uh, is likely to go

18   along with -- with what the group wants to do, and that he

19   would not be capable of, uh, uh, masterminding a

20   large-scale, uh, drug importation such as this.

21        And, uh, Judge, I would ask the Court to consider

22   that, uh, report, uh, to the extent that the Court is able

23   to do so.

24        That's all I have at this time.

25        THE COURT:  Give me just a second to read over

```
 1    the report.
 2              (Pause) (10:53 a.m.)
 3         Mr. Kunz.
 4         MR. KUNZ:   Thank you, Your Honor.
 5         Your Honor, with respect to the first objection
 6    by the defendant, I think the case law in the Eleventh
 7    Circuit indicates, uh, quite clearly that the total amount
 8    of, uh -- of believed-to-be a controlled substance is what
 9    governs the calculation.
10         United States versus Pessefall,
11    P-E-S-S-E-F-A-L-L, at 27 F-3rd 511.  In that particular
12    case, Judge, there was, uh, a quantity of fake cocaine
13    involved, and Defendant Pessefall argued, uh, for the
14    Eleventh Circuit that the District Court erred in
15    attributing the full two hundred and fifty kilograms of
16    cocaine to him and his co-defendant for sentencing.
17         Uh, he argued he was responsible only for 49
18    kilograms, which was the authentic cocaine involved in the
19    offload.
20         The, uh, Eleventh Circuit, uh, disagreed with the
21    defendant and affirmed the District Court and the
22    Government's position in that case -- and equally here --
23    is that this defendant -- that Defendant Pessefall is to be
24    responsible for the total amount of cocaine because he
25    helped unload the fake cocaine.
```

```
 1              THE COURT:  Of course, it wouldn't make any
 2   difference --
 3              MR. KUNZ:  That's correct.
 4              THE COURT:  -- to the guidelines.
 5              MR. KUNZ:  Well, Judge, it would if, in fact, you
 6   are only counting the --
 7              THE COURT:  Well, counted one, yes.  But if I put
 8   all of the cocaine and all of the offloads together in
 9   which there was actually cocaine, it wouldn't.
10              MR. KUNZ:  Well, our position, Judge, is under
11   Eleventh Circuit precedent, that argument of counsel should
12   be rejected.
13              THE COURT:  I don't disagree.
14              MR. KUNZ:  Also, Judge, uh, counsel, in
15   discussing some of these things, uh, I just -- I know the
16   Court's aware of it, and the probation report indicates it
17   quite clearly, but this defendant was -- was integrally
18   involved in all of the drug activities, starting with the
19   initial offload from November of '93, which was in response
20   to the October, uh, invitation by Detective Jankens, are
21   you interested in doing this?  You know.  If not, fine.
22              And the defendant jumped at it right away.  Yes,
23   we are.  I want to.  And it -- it continued from November
24   through January of '94 to March, August, September of '94.
25   It also included later transports by him in February of
```

1    '94.

2         The firearm enhancement, Judge, that the -- that

3    counsel objects to, uh, first of all, Judge, the, uh,

4    defendant made the decision to take firearms with him on

5    those two offloads in March, and again in August.  He was

6    specifically -- he specifically asked Detective Jankens if

7    he should bring the gun, and Detective Jankens indicated

8    it's up to you.

9         Uh, and of course this defendant, Judge, is the

10   one making the statements -- if the Court recalls that tape

11   recording from March 18th -- that he would personally kill

12   anybody who disclosed any information, uh, with respect to

13   the offload, or if he had any problem, whether it be a

14   brother or a citizen, he would kill them.  And this is --

15   this is the defendant talking about that.

16        And then we have him, uh, carrying a firearm, uh,

17   both on the March 19th offload and again in the August, uh,

18   uh, 31st offload.

19        And there was testimony at trial that, in fact,

20   it was a gun.  So clearly, Judge, based on those two

21   offloads, the firearm enhancement would be appropriate.

22        But more specifically, Judge, in addition as the

23   Probation, uh, Department adequately found, this defendant

24   in May of 1994, uh, had a firearm, and there was a

25   videotape introduced at this -- on this occasion when the

1    defendant went with Special Agent Martin to collect drug

2    proceeds.  This was part of the drug conspiracy count,

3    Count 3, which the defendant was convicted of.  Counsel

4    talked about there was a JOA or something, Judge.  It

5    wasn't charged as a specific count.  There was no JOA of

6    this matter.

7         The videotape showed the defendant, when Special

8    Agent Martin exited the, uh -- the pickup truck to collect

9    the money from a drug dealer, pulled the semi-automatic out

10   and hold it and look around.  Clearly, he was using, uh, a

11   firearm at that time, Judge.  And of course the Supreme

12   Court indicated in Bailey under the 2D1.1 enhancement, you

13   don't even need use.  Possession is sufficient.

14        So our position, Judge, is for, uh, under any of

15   those bases, the, uh, firearm enhancement would indeed be

16   appropriate.

17        Judge, I don't think it's appropriate for counsel

18   at this point to attempt a retroactive application in the

19   Bailey case.  I think that's what he's trying to do.  This

20   defendant's been convicted of two counts on 924(c), and I'm

21   not sure --

22        THE COURT:  Well, that's an appealable issue,

23   number one, but number two, it would appear from the

24   reading of the Bailey case it's not applicable anyway.

25        MR. KUNZ:  Right.  And our position, Judge, is

1    that he was convicted of carrying under 924(c), and as the

2    Court correctly noted, the Bailey case was explicitly

3    concerned with the use prong of 924(c).

4         And, uh, as the Court, uh, can recall in the

5    Bailey case, the Supreme Court, uh, returned this decision

6    to the District Court of Appeal for consideration of that

7    basis, for upholding the convictions for the -- on the

8    carry prong in 924(c) because the, uh, Court of Appeals had

9    not discussed that particular prong of 924(c).

10        Uh, so -- and our position, Judge, is clearly he

11   was carrying here and, uh, we never urged that he should be

12   convicted under use, which the Supreme Court has said means

13   more than just possession. So we don't think that's, uh, a

14   sufficient argument.

15        Bailey is inapplicable for several reasons:

16   Number one, it's totally inapplicable to the 2D1.1 firearm

17   enhancement and by -- the Supreme Court says so in its

18   decision.

19        Uh, and secondly, Judge, the 924(c) counts I

20   don't think can adequately be challenged by the defendant,

21   uh, based on the, uh -- his, uh, objection to the guideline

22   calculation as he had -- as he's done.

23        With respect to role in the offense, Judge, uh, I

24   think there's really several factors that are important to

25   the Court. Uh, this defendant was a leader, organizer,

1    supervisor of others. And I know the doctor's report

2    indicated that, uh, in that doctor's opinion he couldn't

3    mastermind a major drug deal. He wasn't charged and

4    convicted of masterminding a major drug deal, and this

5    enhancement doesn't talk about masterminding. It --

6    what it talks about is, uh, having control or supervision

7    of other individuals. And he clearly had that.

8         It was his decision as the Court can recall the

9    numerous tape recordings starting from December of '93 as

10   to who he would bring on the offloads, uh, for the January

11   offload, and he decided who to bring on those particular

12   offloads. Likewise, in the March, he told -- March

13   offload -- he told Detective Jankens who he was going to

14   bring.

15        Uh, again in the August offload, even though

16   Mr. Ruof had taken over as president, uh, he discussed and

17   he brought in a list to Detective Jankens as to what

18   individuals would be brought.

19        And clearly he, uh, had a supervisory role as to

20   the other members. Uh, at least as through the March

21   offloads, Judge, he was the president of the Outlaws

22   Motorcycle Club chapter in Tampa, and he -- he exhibited

23   quite a bit of control over those members, over the

24   probates, over who does what. Uh, even Mr. Beasley, his

25   testimony, Judge, indicated, uh, Mr. Harrison's role as a

1    boss and what could or could not be done.

2         So we would submit, Judge, the evidence would

3    indicate, especially with respect to the offenses of

4    conviction, that he was, in fact, a leader and a

5    supervisor, and a four-level enhancement would be

6    warranted.

7         I point out, Judge, that in addition to the facts

8    that I've outlined, Mr. Harrison received the money, uh, on

9    at least one or more of the offloads from the undercover

10   agent, and he gave them -- he gave that -- the sums of one

11   thousand dollars to each of the individuals.  You recall

12   the videotape.  They would come up and he would hand them

13   the thousand dollars after Detective Jankens, uh, provided

14   him with the money.

15        And the numerous conversations, Judge, with

16   Mr. Harrison and Detective Jankens over in the months of

17   January, February, and March of '94 and through September

18   of '94, indicated without any doubt Mr. Harrison, uh,

19   played a major role with respect to this drug activity and

20   was the supervisor, uh, and leader of the conduct -- at

21   least through March of 1994.

22        We would, uh -- with respect to the objection of

23   criminal history, Judge, we would submit the Court records

24   indicate that he was indeed placed on probation and that,

25   uh, pursuant to the guideline section, uh, uh, his criminal

```
 1    conduct was committed while he was on probation and the

 2    Probation Office indicated that, in fact, there was some

 3    meetings, some overt act committed as part of the

 4    conspiracy within that one-month probation.  And we would

 5    submit, Judge, that the Probation Office has correctly

 6    scored, uh, Mr. Harrison as a -- as a category two.

 7             Your Honor --

 8             THE COURT:  You didn't address the 3E1.1.

 9             MR. KUNZ:  Yes, ma'am.  Let me come back a little

10    bit to that.

11             THE COURT:  All right.

12             MR. KUNZ:  The, uh, acceptance of responsibility.

13    Frankly, Judge, I don't know how else to say it, other than

14    the Government's still waiting for Mr. Harrison to

15    demonstrate some acceptance of responsibility in this case.

16             He, uh, sure has not clearly demonstrated any

17    acceptance of responsibility for his conduct.  Uh, we

18    haven't seen it anywhere, Judge, and I think his denial of

19    the beating of Ms. Dinsmore is indicative that he's not

20    accepted responsibility for his conduct.

21             Although he was, uh -- the jury could not reach a

22    verdict on the racketeering, uh, acts, Judge, they did --

23    or racketeering charge -- they did, with respect to

24    Mr. Harrison, find that the Government proved beyond a

25    reasonable doubt the beating incident and the extortion of
```

1     Ms. Dinsmore with relation to the enterprise.

2          And that is, in fact, relevant conduct that the

3     probation has looked at.  And the case law, Judge, is that

4     if the defendant, uh, does not accept certain relevant

5     conduct, it's inappropriate for an awarding of an

6     acceptance of responsibility.

7          And it's our position, Judge, that in many

8     situations, defendants who plead guilty are not awarded

9     acceptance of responsibility based on the untimeliness of

10    their alleged assertion of the acceptance of

11    responsibility, and other factors.

12         Here, Judge, uh, the defendant put the Government

13    to its burden of proof at trial, uh, and we would submit

14    that based under 3E1.1, comment note two, uh, uh, reduction

15    for acceptance of responsibility is not applicable to the

16    defendant who puts the Government to its burden of proof at

17    trial.

18         And I think in that same note two, Your Honor, at

19    the end of that note, uh, there's some discussion that

20    normally the acceptance, uh, demonstrated by a defendant

21    would occur in terms of his pretrial conduct and

22    statements.  And of course that has not, uh, occurred.

23         And, uh, we -- we would indicate that, uh -- or

24    it's our position, Judge, that acceptance of responsibility

25    is not appropriate for Mr. Harrison.  It's not been

1    demonstrated.  His denial of the Dinsmore incident is a

2    further indication that he's not accepted responsibility

3    for any of the conduct in this particular case.

4         We would urge the Court to, uh -- or overrule or

5    deny any defendant's objection as to the other paragraphs

6    concerning other relevant conduct.  We think it's part of

7    the overall conduct in the case, and we agree with the

8    Probation Department that 1B1.3 makes those other

9    paragraphs that they object to irrelevant.

10         It's our position, Judge, that, uh, there's not a

11   sufficient basis for any downward departure.

12         Now, the -- just lastly looking at the letter

13   of -- or the psychological testing report of Mr. Harrison

14   that Mr. Brunvand provided to the Court, Judge, uh, again,

15   in taking a look at that, the guideline provision -- I

16   think it's Section 5H1.3 -- uh, indicates that ordinarily

17   that's an insufficient basis, a defendant's mental

18   condition, for any departure from the applicable

19   guidelines.  And we would urge the Court that it's really

20   of no significance what he's urging the Court.

21         It may well be, Judge, only when, in fact, any

22   period of supervised release that the Court imposes, that

23   this should be considered as possibly a condition of any

24   supervised release if, in fact, the Court finds that he is

25   in need of some sort of counseling.

1           But I find it curious, Judge, and it's

2   interesting that this doctor indicates there's no way he

3   could mastermind a major drug deal; he is a follower.

4   Well, Judge, I don't believe this doctor who examined Mr.

5   Harrison was provided with the tape recordings and the

6   videotapes, and the evidence in this case of this defendant

7   being a boss for a number of years of an Outlaw Motorcycle

8   Club here in Tampa.

9           Obviously, it's a stressful position, Judge, with

10   the numerous contacts with individuals and decisions that

11   have to be made, and there was no doubt he was the boss,

12   and he was making decisions and -- in every respect.  And

13   it's interesting that this doctor would indicate that this

14   person at best within the group is a follower.

15           Well, I think it's, uh -- it's contradicted by

16   all the evidence in this case.  So we won't -- do not

17   believe, uh, uh, Dr. Pine -- or Mr. Pine's letter to the

18   Court has any significance, either in negating the role

19   enhancement for the defendant, or in providing any sort of

20   basis for any departure.

21           Lastly, Judge, I know it hasn't been discussed by

22   counsel, but, uh, I would anticipate the Court may consider

23   a downward departure based on Eleventh Circuit precedent in

24   United States versus Williams, Judge.  We would submit that

25   it's inappropriate and there can be no downward departure

1   based on the Government's role with respect to this --

2   these offloads.

3          Uh, Judge, for the Court to make such a finding I

4   think the Court's indicating that in every offload case

5   automatically there should be a downward departure in every

6   offload case, because in every offload case of a reverse

7   type situation, the Government's controlling the quantity;

8   controlling the circumstances of where it's coming; the

9   airport; the location.

10         We don't believe, Judge, that there's any factors

11  involved in this case that take it outside the heartland of

12  cases, uh, warranting any sort of, uh, downward departure.

13  And further, Judge, any -- any such position flies in the

14  face of the United States versus Williams.  It's clearly,

15  uh -- such a determination by the Court is, in effect, some

16  sort of sentencing entrapment.

17         And we would urge the Court not to -- although I

18  understand the Court's, uh, prior decision, and I fully

19  expect the Court to follow that, we would urge the Court

20  not to, uh, grant a downward departure for Mr. Harrison.

21         Again, the facts being -- with respect to

22  Mr. Harrison would be, as another factor, different than

23  some of the other defendants.  He was a major mover and

24  shaker with respect to all of these, uh, situations, these

25  are offloads, and what-have-you, Judge.

1          Uh, he was given every opportunity, uh, I would

2     suggest, unlike some defendants you saw yesterday maybe not

3     to know all of the full parameters, Mr. Harrison knew all

4     the parameters -- everything he was getting into.  So much

5     so, uh, if you can recall back in November, prior to the

6     November '93 offload, Detective Jankens said, I think we

7     need a number of people to come to that offload.  And he

8     only brought Mr. Sprinkle.

9          And after that they did offload all that

10    marijuana and they were exhausted, they indicated, we sure

11    do need more people.  And it progressed in terms of, uh,

12    his role, and the number of people and how they can most

13    efficiently move the dope and get it off the airplane and

14    put it in the truck and then move it on out of there.

15          And this defendant, uh, Your Honor, it's just not

16    conceivable to the Government how there could be a

17    departure based on the, uh, lack of control that the

18    defendant had when his participation was knowing and

19    voluntary and complete in every manner and shape.  And we

20    would urge the Court not to grant a downward departure.

21          THE COURT:  All right.

22          Anything else, Mr. Brunvand?

23          MR. BRUNVAND:  The only thing I would add, if --

24    I thought I had asked for the downward departure, and if I

25    didn't, I would, based on the same reasons that were stated

1    by Mr. Wells earlier today, and also the, uh, reasons that

2    the Court gave for granting a downward departure.

3         I would ask the Court also to consider when, if

4    the Court grants a downward departure, to look at the

5    sentences that, uh, his fellow co-defendants received in

6    determining the number or levels that the Court would

7    depart.

8         THE COURT:  All right.  Let met rule on the

9    objections.

10        The first objection by the defendant was an

11   objection based upon the quantity of cocaine under

12   United States Sentencing Guidelines 2D1.1.  And I think the

13   case law is clear that it is not actually what was

14   unloaded, but what the defendant perceived was cocaine.

15   And it really makes no difference in the guidelines anyway,

16   because even if I take into consideration all of the actual

17   cocaine in all of the offloads and transports Mr. Harrison

18   participated in, we would still reach a level of 38.

19        So I'm going to overrule that objection.

20        The second objection has to do with a firearm

21   enhancement, and the probation officer's assessment that a

22   two-level upward adjustment is appropriate because of the

23   firearm, the carrying of a firearm by Mr. Harrison on two

24   occasions.

25        And it is appropriate, and I agree.  I'm going to

1    overrule that objection.  Clearly, Mr. Harrison carried the

2    firearm.  I don't think there is any dispute.  The jury

3    found him guilty of it.  It was clear on the video that he

4    had the firearm on those occasions.  So that's just

5    undisputable -- or indisputable, and I don't know that

6    there is any reason that this could be challenged.

7           I'm going to talk about the sentence on those

8    counts for a violation of 18 United States Code Section

9    924(c) in a few minutes.

10          As to the role in the offense, the Probation

11   Office had assessed a four-level increase for

12   Mr. Harrison's role in the offense, under 3B1.1.

13          And I think that was appropriate.  Mr. Harrison

14   clearly was the organizer.  He brought many of the Outlaws

15   into the offloads, into the transports.  He was not

16   obviously a minimal player, not a minor player.  He's not

17   entitled to any type of reduction.  But he's not even on

18   the level of Mr. Brunet or Mr. Sprinkle, for example, who

19   would get no increase.

20          He was clearly, if anyone was, the organizer of

21   this Outlaw Motorcycle Club and of the offloads, the

22   transports, and anything else that occurred.  So he is

23   entitled, I believe, to the four-level increase that the

24   probation officer has stated for his role in the offense.

25          Acceptance of responsibility.  Under

1    United States Sentencing Guidelines 3E1.1, I'm going to

2    overrule that objection as well.  Mr. Harrison went to

3    trial.  I've seen no acceptance of responsibility, and I

4    don't know under any stretch of the imagination how he

5    could be entitled to a two-level decrease or adjustment

6    downward for acceptance of responsibility.

7            As to the criminal history category objection,

8    paragraph 137, United States Sentencing Guidelines 4A1.1(d)

9    criminal history, I have before me a copy, and I'm sure you

10   both have seen it as well, from the Circuit Court for the

11   Sixth Judicial Circuit of Florida in and for

12   Pinellas County.  And it is a conviction.

13           It states that Mr. Harrison entered a plea of

14   nolo contendere to the offense of shooting at, or within,

15   or into a building a defendant -- the defendant being

16   present, uh, with counsel at that time.  He was

17   adjudicated, uh -- no, he wasn't.  Adjudication of guilt

18   was withheld.  He was placed on a period of probation for a

19   period of 30 days, and it does say Court -- direct

20   Court-supervised probation.  And there were certain

21   conditions of the probation.

22           I don't -- without any case law and without any

23   statute, I'm hesitant to rule on the issue of whether there

24   is such a thing as Court-supervised probation or not, so

25   I'm just not going to get into that.

1          I will say to you that he was placed on a period

2     of probation for 30 days for this, and I think that the

3     two-level increase for being on probation for a period of

4     30 days probably overstates the criminal record, and I

5     think he's probably more -- more applicably scored as a one

6     rather than under category two of his criminal history.

7          I just think that this type of probation for a

8     period of 30 days, adjudication withheld, overstates the

9     criminal record for assessing two extra points, which would

10    result in a criminal history category of two.  So I think

11    it's more properly a criminal history category of one.

12         And I will -- that's not exactly the objection,

13    but I will sustain that objection.

14         As to paragraphs 20, 21 and 22, defendant objects

15    to the factual information presented in these paragraphs.

16    I'm going to overrule that objection.

17         And then there is sort of a blanket objection to

18    all numbered paragraphs in the offense conduct section of

19    the report which present facts beyond those relevant to the

20    specific counts where he -- for which he was convicted.

21    And I will overrule that objection, as well.

22         Now, I don't believe -- and maybe you can correct

23    me if I'm wrong, I don't believe that I have made any

24    change other than the criminal history category; is that

25    correct?

1          MR. WILLIAMS:  That is right, Your Honor.

2          THE COURT:  So it would be a total offense level

3    of 44, with a criminal history category of one; is that

4    correct?

5          MR. WILLIAMS:  That's right.

6          THE COURT:  Now, you are correct, I am going to

7    depart, as I have with the previous defendants, finding

8    that under 18 United States Code Section 3553(b), a

9    sentencing court may impose a sentence outside the range

10   established by the guidelines if the Court finds there

11   exists a mitigating circumstance of a kind or degree not

12   adequately taken into consideration by the Sentencing

13   Commission in formulating the guidelines that should result

14   in a sentence different from that called for by the

15   guidelines.  And it's a characteristic or circumstance

16   present which distinguishes the case from the heartland

17   cases.

18          And I think a departure is warranted in this

19   case, as well.  I am analogizing to application note 17 of

20   the United States Sentencing Guidelines 2D1.1, which

21   arguably -- and does -- apply to a reverse sting situation,

22   so it's not factually exact.  I'm just simply analogizing.

23          Here the defendant was not a purchaser, but he

24   was someone that was paid an amount of money to transport

25   and to offload.  And I'm going to find that a departure

1    downward of four levels, since there is a mitigating

2    circumstance of the kind not adequately taken into

3    consideration by the guidelines, the inclusion in the

4    offloads of an enormously large amount of drugs, the amount

5    of which he had no control.

6         Now, going down a departure of four levels would

7    bring it down to a 44, with a category one, which would

8    be -- still out to life; is that right?  360 to life?

9         MR. WILLIAMS:  Forty-four down to 40 --

10        THE COURT:  I'm sorry, going down to 40 would be

11   292 to 365.

12        MR. WILLIAMS:  That's right.

13        THE COURT:  All right.

14        Now, let me address the other issue that -- that

15   I did not address, and say -- I said that I would like to

16   put that off for a later time in the sentencing hearing,

17   and that has to do with the Bailey case, and also the

18   sentences that will be imposed as a result of two

19   convictions under 18 United States Code Section 924(c).

20        I don't dispute the fact that this is a harsh,

21   harsh statute, but clearly it is a statute.  And the jury

22   convicted Mr. Harrison of these firearm possession charges

23   under 924(c).  The statute clearly provides that whoever,

24   during and in relation to any crime of violence or drug

25   trafficking crime, possesses a firearm shall, in addition

1    to the punishment provided for such crime of violence or

2    drug tracking crime, be sentenced to imprisonment of five

3    years.    Actually it includes an enhanced punishment

4    committed by someone who uses or carries a firearm.

5             In this case, it -- the jury convicted him of

6    that.

7             It shall be -- the punishment shall be imposed

8    and shall provide that a punishment for this shall be

9    consecutive, an imprisonment of five years, which shall run

10   consecutive to any other sentence imposed.    In the case of

11   a second or subsequent conviction under this subsection,

12   such a person shall be sentenced to imprisonment for 20

13   years.    And again, there is a specific admonition that

14   probation or suspension of this sentence shall not occur.

15   And if convicted, the Court shall impose a term of

16   imprisonment which should not run concurrent with any other

17   term of imprisonment.

18            There's no doubt that that's a harsh penalty.

19   What it says is the Court shall impose a consecutive

20   sentence, five years for the first carrying of firearm, and

21   20 years for the second.

22            But that's what the statute says, and I don't

23   think I have any alternative but to do that.

24            The Bailey case -- and I have carefully read

25   that, and we have discussed it -- the Bailey case, which

1    was recently decided on December the 6th, 1995 by the

2    Supreme Court, is factually dissimilar in light of the fact

3    that both of the defendants in the Bailey case, the firearm

4    was in a locked trunk, one was a car trunk, a bag in a

5    locked car trunk, one was locked in a trunk in the bedroom

6    closet, and the Court said, uh, that it wasn't appropriate

7    to hold the defendant accountable under the use portion, or

8    use prong of the statute.

9         Here I think he -- Mr. Harrison clearly could be

10   held accountable under the carry prong of the statute in

11   light of the fact that the gun was located on

12   Mr. Harrison's person.

13        And the Court specifically says in Bailey that

14   they are not addressing that issue, and remanded it back to

15   the lower court to address the carry prong.

16        So, Bailey, I don't think, should change anything

17   that I do here.  And at any rate, that would be an issue

18   for the Circuit Court to decide, and not for this Court.

19        So with that, Mr. Brunvand, do you have any

20   witnesses or anything else you would like to say before we

21   start with sentencing?

22        MR. BRUNVAND:  Judge, Clifford Raisor,

23   Mr. Harrison's father, is present in the courtroom.  I

24   believe he would like to make a statement to the Court.

25        THE COURT:  All right.

1    Sir, would you begin by stating your name, and

2    spelling your name for the court reporter.

3    MR. RAISOR:  My name is Cliff Raisor.

4    R-A-I-S-O-R.

5    Uh, Your Honor, I -- one moment.

6    (Pause)

7    THE COURT:  Would you be more comfortable sitting

8    up in the witness chair?

9    MR. RAISOR:  No, I'll get back with you.  I

10    haven't slept.

11    (Pause)

12    THE COURT:  Would you like to sit down, and we'll

13    come back to you?

14    MR. RAISOR:  No, I'm, uh -- I'm in good shape.  I

15    just, uh, uh, am physically and mentally exhausted.

16    (Pause)

17    I, uh, was asked by the defense lawyer to make

18    this as brief as possible, and I will, in respect to the

19    Court.

20    There's a -- I had a whole bunch of things going

21    back --

22    THE COURT:  Do you have another witness,

23    Mr. Brunvand?  I'll be happy to switch.

24    MR. BRUNVAND:  I don't, Your Honor.

25    THE COURT:  Okay.

1          MR. RAISOR:  I'm not going to take up the Court's

2     time going back to his youth, uh, when he was lied to --

3          THE COURT:  Why don't you --

4          MR. RAISOR:  -- I was reported killed.  And --

5     and, uh --

6          THE COURT:  Why don't you read -- read your

7     statement.

8          MR. RAISOR:  I was reported killed in, uh --

9     in -- I don't even remember where, what it was now, Korea.

10    They lived with this for some time.  They were taken away.

11    I went for years trying to find them.

12         THE COURT:  Do you have --

13         MR. RAISOR:  And when I did find him, uh, my

14    oldest boy got killed.  And, uh, so it was quite a distress

15    on him.  And, uh, his mother died, uh, with cancer.  My

16    wife presently has cancer.

17         Uh, I am so tired, I can't hardly stand it.  But

18    I'll be with you, please allow me to do --

19         THE COURT:  I don't have any objection.  What I

20    was going to suggest is perhaps you read what you have

21    written there and that may make it easier for you.

22         MR. RAISOR:  Well, I had some stuff written, but

23    I don't -- I'm not going to go through all of this.

24         I, uh -- I just -- but there's things this Court

25    has to know about this man.

1          MR. BRUNVAND:  Can I help you out?

2          Let me help you.

3          Judge, I spoke with Mr. Raisor this morning

4    and -- and -- and what he told me, and what he wanted to

5    tell the Court is that Mr. Harrison, as a child, when

6    Mr. Harrison was 19 years old was placed with

7    Mr. Harrison's family.  That they had told Mr. Harrison

8    that he died in Korea --

9          THE COURT:  That his father died?

10          MR. BRUNVAND:  That his father died.  He searched

11    for him, he found him when he was nine -- let me finish.

12    Uh, coming back and having found his children, uh, finding

13    Mr. Harrison and -- and with a lot of tragedy in the

14    family, uh, Mr. Harrison was very proud of his father

15    and -- and his military service.  Uh, Mr. Harrison went off

16    to Vietnam and -- and I think basically that's what you

17    wanted to say?

18          MR. RAISOR:  Well, I have a few more -- I'll be

19    all right now.

20          They, uh -- I'm upset.  My wife has cancer, and

21    that man is not all bad.  I don't know nothing about no

22    Outlaw gang.  I met them on a couple, three occasions when

23    they were at my house.  I mean, he'd bring somebody with

24    him.  And while they was at our house, there wasn't a

25    filthy word.  They were decent.  I mean, they never caused

1   me no problems.  So I -- I have no nothing to say against

2   the Outlaw gang because I don't know anything about them.

3        I am presently involved -- everything I can say

4   will be -- bear with me -- please record it, I don't care.

5   Everything's a matter of military record, or record -- at

6   least as of right now, I'm involved -- I was a -- went

7   through the Police Academy in Indianapolis for the

8   Reserves.  I was special deputy several times in Jefferson

9   County.  My brother got four citations for bravery in the

10  Indianapolis Police Department.  I mean, the family, uh --

11  and I haven't got to Bruce yet.

12       But, uh, I, uh -- I don't know.  I don't know --

13  uh, I -- no two snowflakes are alike.  I mean, that was

14  said a long time ago.  Uh, I realize that I can't say

15  nothing about him.  No lawyer -- I was a field service

16  engineer for Westinghouse, for steam turbines.  And, uh, I,

17  uh -- if I say something, correct me and I'll apologize and

18  start all over.

19       But I'm sure there's a lot of loving parents in

20  this courtroom, and I'm sure one.

21       The closest I come to getting killed in Korea was

22  22 days in the Army Hospital.  I -- when he went to

23  Vietnam, he looked at my uniform and he said, I'm going to

24  bring back some more medals.  And I said, take one of them

25  and a quarter, you can get a cup of coffee.

```
 1              Vietnam was a political thing, everyone knows.
 2   There's been thousands and thousands of words written on
 3   this.  Uh, I won't go into detail on this, uh, but it's a
 4   matter of military record.  Each time he was wounded, I
 5   would check with the Marine Branch in Washington, D.C.
 6   through the Red Cross.  He was wounded four times.  He,
 7   uh -- there's nothing to be said today.  I understand that
 8   this is all settled.  I wish I would have been here before.
 9   I wanted to come, but I thought maybe I shouldn't.
10              Bruce was concerned that, uh -- he knows the love
11   I got for him, and he knew -- was afraid I might get myself
12   in trouble.  Oh, would I love to.  I'll trade places with
13   him today and give you every cent I got, and my house.
14              But he -- he was on patrol one time, and I know
15   that area over there because I was there, and down the road
16   a ways, and, uh -- but, uh, you go out on patrol down the
17   same path, they know you're going to come down that path
18   because they've been there and -- and you're a land mine.
19   His point man stepped on a land mine.  He got part of it.
20   Shrapnel went in his guts and his legs, through his
21   privates, uh, I almost had to go to Vietnam on that one
22   because our blood type is crazy.  And -- but nothing to be
23   said about when the squad was out -- 15 men in the squad.
24              THE COURT:  Now, are you talking about Mr. -- are
25   you talking about your son?
```

1    MR. RAISOR:  I'm talking about him.  I'm talking

2    about him.  Fifteen men in a squad.  Uh, 15 men in his

3    squad wrote me.  It take me four hours to answer those

4    letters that I was so proud.  And, uh, they nicknamed him

5    John Wayne, uh, which didn't mind at the time.  Uh, but

6    they said, we'll take care of him after this.  And they'd

7    write me letters, oh, you're so nice, I wish you -- I had a

8    father like you.  God, who would want a father like this?

9    But anyway, I wrote those kids.

10    THE COURT:  Mr. Brunvand, we're getting a little

11    off track.  Maybe you can help.

12    MR. RAISOR:  But -- I'll get back with it then.

13    I'm sorry.  I said I would apologize.  I thought I would be

14    allowed the time.

15    THE COURT:  You certainly are, but you need to

16    talk about Mr. Harrison.

17    MR. RAISOR:  Well, I am.

18    THE COURT:  Bruce --

19    MR. RAISOR:  I'm talking about when he got

20    wounded.  But when they wrote me and said that they -- I

21    was getting to a point when -- said, we'll take care of

22    him.  And the next letter I got they said, we told you we

23    would take care of him, but all 15 of them got -- they were

24    standing on a point waiting to go on patrol, one of the

25    gooks walked in, and when he left, he had left a grenade.

1    When he come home -- and the time he'd been in the

2    hospital -- he's still got shrapnel in his -- it's too near

3    his spine now to take it out.

4              Like again, all this is, uh, fact.  It's a matter

5    of military record.

6              The prosecution -- I'm not questioning the

7    prosecution or no one else.  I'm just trying to get it

8    across what I think should be got across -- has, uh, asked

9    for denial of what the doctor has said.

10             He, uh, uh, has needed this doctor for a long

11   time.  The last time he was in Indianapolis he told me that

12   he was getting out of the Outlaws.  And he said I'm getting

13   too old for this stuff.  And he said, there's laser things,

14   and I'm going to have all my tattoos taken off, all but

15   one, I'm going to keep my Marine tattoo.

16             But, uh, we don't have the money to afford a

17   parade through Tampa like certain cases in Los Angeles.  We

18   don't have the money for that.  He's not going to walk out

19   of here today because we don't have the money for that.

20   And that's a shame.  He never played professional football,

21   but I seen him play football in school.

22             But we're comparing cases here.  I heard the

23   defense, uh, compare cases with the Williams case, and this

24   and that.  I'm -- so I think it's only fair that I could

25   compare these.

1    We convicted a man, a professional prize fighter

2  in Indianapolis for a rape.  He got three years.  You know

3  where he got it?  Plainfield Youth Center.  Three years.

4    My son's facing life in prison.  I'm going to

5  knock this off, Your Honor.  I -- see if I can say, uh --

6  I've lost it.

7    I appreciate the time you've given me, uh, but --

8  just a second.

9    I don't know, uh, I know that I carry a

10  disability from the Government -- Army.  I'm really tied up

11  with my wife.  I'm probably going to lose her.  And, uh,

12  when he's, you know, sent away, I don't know if you have

13  any influence, I would -- there is a Federal penitentiary

14  at Terre Haute.  It would sure help the family.  We've

15  tried to do our best, uh, there's been a mistake made here

16  and there.  Everyone has made mistakes.  God, he paid in

17  Vietnam.

18    You get purple heart, and I don't care in

19  anybody's category, that's -- you're a hero.  I don't care

20  who outlines it.  That man, after he was wounded the second

21  time, he volunteered to go back into the bush.  He went

22  ahead and went back up there.  He went back a third time.

23  Then he went to USS Sanctuary Hospital.  He went back the

24  fourth time.  He was there six days.  He got hit again.

25    God, let that count for something, Your Honor.

```
 1      It's people like that why we're walking free.

 2              (Pause)

 3              You're a human being and I hope you have children

 4      you love.

 5              THE COURT:  I do, thank you.

 6              MR. RAISOR:  Thank you for your patience.

 7              THE COURT:  Mr. Brunvand, do you have any other

 8      witnesses?

 9              MR. BRUNVAND:  No, judge.

10              MR. RAISOR:  Your Honor, uh, I know it's out of

11      line, I know you're going to take him away, can I at least

12      touch him?

13              THE COURT:  I tell you what, why don't you have a

14      seat right now, let me finish with the sentencing, okay?

15              Mr. Harrison, Mr. Brunvand, Mr. Kunz, if I could

16      get you to approach.

17              (Pause)

18              There's a couple of things I didn't understand.

19      Mr. Harrison, let me direct this to you, or Mr. Brunvand,

20      whoever wants to answer it.  Your father made some comments

21      about him being -- you being lost, or -- or going to live

22      with someone else -- or, I didn't understand.

23              MR. BRUNVAND:  His father was 19 when he was

24      born.  Uh, his mother, uh, had left, and a family by the

25      name of Harrison basically adopted Mr. Harrison.  Uh, they
```

```
 1    told him that the father was dead, and his father searched

 2    for them and found them -- and by the age of nine, I

 3    believe.  So that's what that was about.

 4              THE COURT:  And did he ever live with his father?

 5              THE DEFENDANT:  Yes.

 6              THE COURT:  When, after --

 7              MR. BRUNVAND:  After -- in his teens, I believe.

 8              THE DEFENDANT:  When I was 13.

 9              MR. BRUNVAND:  Thirteen.

10              THE COURT:  Mr. Brunvand, is there anything you

11    would like to say regarding sentencing in this matter?  You

12    know --

13              MR. BRUNVAND:  Judge --

14              THE COURT:  -- I, uh -- I don't have a whole lot

15    of discretion here.

16              MR. BRUNVAND:  I understand that.  Uh, I don't

17    know that I can say, uh, anything other than what

18    Mr. Raisor has said.  The only thing I would ask, and

19    there's no case law to support it, there's nothing to

20    support it, other than that I think it's wrong, and that is

21    not to impose the 25 consecutive -- not to throw away the

22    key.  And that's all I have to say.

23              THE COURT:  Mr. Harrison, is there anything --

24    anything you would like to say, sir?

25              THE DEFENDANT:  No.
```

1          THE COURT:  Mr. Kunz.

2          MR. KUNZ:  No, Your Honor.

3          THE COURT:  Mr. Harrison, on August the 29th,

4    1995, you were convicted by a jury of Count 3 of the Second

5    Superseding Indictment charging you with conspiracy to

6    possess with the intent to distribute cocaine,

7    methamphetamine and marijuana, in violation of Title 21,

8    United States Code Section 846; Counts 32, 34 and 42 of the

9    Second Superseding Indictment, charging you with possession

10   with the intent to distribute cocaine, in violation of

11   Title 21, United States Code Section 841(a)(1); Counts 29

12   and 33 of the Second Superseding Indictment charging you

13   with possession with the intent to distribute cocaine, in

14   violation of Title 21, United States Code Section

15   841(a)(1); Counts 25, 35 and 40 of the Second Superseding

16   Indictment charging you with possession with the intent to

17   distribute marijuana, in violation of Title 21, United

18   States Code Section 841(a)(1); Count 36 of the Second

19   Superseding Indictment charging you with the use of a

20   firearm in relation to a drug trafficking crime, in

21   violation of Title 18, United States Code Section 924(c);

22   and finally, Count 41 of the Second Superseding Indictment

23   charging you with the use of a firearm in relation to a

24   drug trafficking crime, in violation of Title 18, United

25   States Code Section 924(c).  And we've now reached the

1    stage of the proceedings where it is my duty to impose

2    sentence in this case.

3            You've indicated you've read the Presentence

4    Report, and you've discussed it with Mr. Brunvand.  There

5    have been objections to the guideline calculations in the

6    Presentence Report.  I have ruled on those objections and

7    made rulings that I felt were legally correct under the

8    case law and the guidelines.

9            There have also been some objections to the

10   factual statements contained in the Presentence Report, and

11   I have ruled on those.

12           The Court will adopt the factual statements

13   contained in the Presentence Report, as to which there is

14   no objection.

15           As to any controverted factual statements, the

16   Court adopts the position of the Probation Office, as

17   stated in the addendum.

18           The Court determines that the applicable

19   guideline range is as follows:  After I have granted a

20   downward departure and departed downward four levels, the

21   applicable guideline range would be two hundred and

22   ninety-two months to three hundred and sixty-five months;

23   the restitution in this case -- there is no restitution.

24           Fine range, does that change at all?

25           MR. WILLIAMS:  No.  Uh, everything above 38 is

1    the same.

2            THE COURT:  Thank you.

3            Twenty-five thousand to twenty-six million is the

4    fine range.  I'm obviously going to waive the fine, based

5    on the fact that you have a Court-appointed attorney and

6    based on what I have in the Presentence Report indicating

7    that there's no ability to pay a fine.

8            There's a five hundred and fifty dollar special

9    assessment, fifty dollars per each of the counts for which

10   the jury convicted you in this case.

11           I've asked if there's any reason why I should not

12   proceed with sentencing, and have been told there's no

13   reason.

14           Mr. Harrison, do you wish to make any statement

15   in your behalf, or say anything at this time?

16           THE DEFENDANT:  No, Your Honor.

17           THE COURT:  All right.

18           The Court having asked the defendant why judgment

19   should not now be pronounced, and no cause being shown to

20   the contrary, the Court having reviewed the Presentence

21   Report, pursuant to the Sentencing Reform Act of 1984, it

22   is the judgment of the Court that the defendant, Bruce

23   Wayne Harrison, be hereby committed to the custody of the

24   Bureau of Prisons to be imprisoned for a term of two

25   hundred and ninety-two months as to Counts 3, 32, 34 and

1    42; as to Counts 25, 29, 33, 35 and 40.

2          (Pause)

3          And as to Counts 36 and 41, I am going to impose,

4    as to Count 36 five years, to run consecutive, and 41, 20

5    years to run consecutive.

6          The sentences as to Counts 3, 25, 29, 32, 34, 35,

7    40 and 42 will be served concurrently, and the sentences as

8    to Counts 36 and 41 will be served consecutive to the above

9    counts, and to each other.

10         My sentencing statement has 42, but it's actually

11   41; is that correct?

12         MR. WILLIAMS:  I believe you are right,

13   Your Honor.

14         THE COURT:  All right.

15         Essentially, Mr. Harrison, the sentence that I am

16   imposing is, I'm imposing two hundred and ninety-two

17   months, which is the bottom end of the guidelines, for each

18   of the counts, with the exception of the counts that

19   involve the possession of a firearm.  I've imposed five

20   years to run consecutive and 20 years to run consecutive as

21   to those counts.  And the statute gives me no room to do

22   anything other than that.

23         Based on your financial status, as I've said, I

24   will waive the imposition of a fine.  I'll assess a five

25   hundred fifty dollar special assessment.

1      I have departed downward from the guidelines, and

2  I've departed for the reason that I have previously stated.

3      The Court having pronounced sentence, does

4  counsel for the defendant have any objections to the

5  sentence or the manner in which it was imposed, other than

6  objections that you might have already made?

7      Mr. Brunvand.

8      MR. BRUNVAND:  None, other than what I've already

9  made.

10      THE COURT:  Mr. Kunz.

11      MR. KUNZ:  No objection, Your Honor.  But did the

12  Court want to impose any -- I think you may have to impose

13  a period of supervised release.  I'm not sure where that

14  fits in, but --

15      THE COURT:  All right.  There was none in my

16  sentencing statement, so that's why I didn't do it.

17      MR. WILLIAMS:  The sentencing statement

18  anticipated a life term in accordance with the --

19      THE COURT:  The -- the supervised release would

20  be a term of supervised release of five years as to each

21  count, with -- what exception?

22      MR. WILLIAMS:  I believe the -- you can take them

23  from the face sheet of the Presentence Report, Your Honor.

24  A term of ten years is required as to Count 3.  Uh, also

25  ten as to Counts 32, 34 and 42 -- no, I'm reading that

1  wrong.  I'd have to go into the body of the report to get

2  those terms, I'm sorry.

3         Page 36, starting at paragraph 175, and it looks

4  as though five years will cover everything.

5         MR. KUNZ:  Five years.

6         THE COURT:  All right.  I will impose a term of

7  supervised release of five years, and supervised release

8  shall follow the standard conditions adopted by the Middle

9  District of Florida.

10        Do you have any other objections?

11        MR. KUNZ:  None other than previously, uh,

12 mentioned to the Court, Your Honor.

13        THE COURT:  Okay.

14        Mr. Harrison, Mr. Brunvand suggested that I

15 ought to depart downward of a level to make your sentence

16 equal to that of the other defendants in this case.  I

17 departed downward four levels, and that is the same

18 departure that I have given to the other co-defendants in

19 this case.

20        You score out higher.  And you score out higher

21 based upon your activities.  Based upon the number of

22 counts that the jury convicted you of, and also based on

23 your role in the offense.  I don't think you should have

24 any departure which should take you down equal to the other

25 co-defendants in this case because I think your actions in

1    this case were certainly more egregious than that of your

2    co-defendants.  So that is why the departure downward was

3    the same.

4            Mr. Harrison, you have ten days to appeal the

5    sentence of this Court.  You're entitled to Court-appointed

6    counsel in your appeal, if you cannot afford one.  Failure

7    to appeal within the ten-day period shall be a waiver of

8    your right to appeal.  The Government also has the right to

9    appeal the sentence that I imposed in this case.

10           Thank you.

11           MR. BRUNVAND:  Judge, if I can only ask one other

12   thing --

13           THE COURT:  Sure.

14           MR. BRUNVAND:  -- and that is, as Mr. Harrison's

15   father requested, that a recommendation be made that

16   Mr. Harrison be placed in a Federal correction facility in

17   Indiana, or close by.  We know there is, I believe, a

18   maximum security facility at Terre Haute, Indiana.

19           THE COURT:  I think that's correct.  Let me --

20   let me check.

21           Is that correct?

22           MR. WILLIAMS:  There is indeed one, Your Honor.

23           THE COURT:  All right.  I will so recommend.

24           MR. BRUNVAND:  Thank you.

25           As far as his father shaking his hand before --

1          THE MARSHAL:  It's against Marshall Service

2    policy, Your Honor, it's against our policy to have contact

3    with -- a prisoner with anyone on the outside.  We have not

4    had the opportunity to search for anything that could be

5    passed on to him.

6          THE COURT:  I -- he only wants to shake his hand?

7          MR. BRUNVAND:  Yes.

8          THE COURT:  That's fine.

9          MR. BRUNVAND:  He wants to say goodbye.

10         THE COURT:  I'd ask him to please have the

11   marshal look at his hand before he shakes it.  Not

12   Mr. Harrison -- his father.

13         All right.  I'm going to leave the bench and --

14   it's fine, just check his hands before he shakes it.

15         THE MARSHAL:  Yes, ma'am.

16         THE COURT:  And Let's bring Mr. Ruof up.

17         THE MARSHAL:  Yes, ma'am.

18         THE BAILIFF:  All rise.

19         (Thereupon, the Court stood in recess at 11:46

20   a.m.)

21

22

23

24

25

1

2    STATE OF FLORIDA        )

3    COUNTY OF HILLSBOROUGH    )

4

5

6

7         I, PAUL K. SPANGLER, Official Court Reporter for

8    the United States District Court, Middle District, Tampa

9    Division,

10        DO HEREBY CERTIFY, that I was authorized to and

11   did, through use of Computer Aided Transcription, report

12   in shorthand the proceedings and evidence in the

13   above-styled cause, as stated in the caption hereto, and

14   that the foregoing pages numbered 1 to 59, inclusive,

15   constitute a true and correct transcription of my

16   shorthand report of said proceedings and evidence.

17        IN WITNESS WHEREOF I have hereunto set my hand

18   in the City of Tampa, County of Hillsborough, State of

19   Florida, this 23rd day of March, 1996.

20

21

22   _____

23    PAUL K. SPANGLER, Official Court Reporter

24

25